# GILMAN *v.* HINSON.

---

PATENTS; INTERFERENCE; REDUCTION TO PRACTICE; DELAY IN FILING APPLICATION; PRIOR USE.

1. To constitute a reduction to practice the device constructed must be fashioned out of a material capable of actual use for the intended purpose. (Following *Paul* v. *Hess,* 24 App. D. C. 467.)

2. Long delay in making use of an invention claimed to have been reduced to practice, or in applying for a patent, is a potent circumstance tending to show that the alleged reduction to practice was nothing more than an unsatisfactory or abandoned experiment; and this is specially the case where, in the meantime, the inventor has been engaged in the prosecution of similar inventions. (Following *Paul* v. *Hess,* 24 App. D. C. 468; *Fefel* v. *Stocker,* 17 App. D. C. 321; *Funk* v. *Haines,* 20 App. D. C. 288; *Glidden* v. *Noble,* 5 App. D. C. 480; *Guilbert* v. *Killinger,* 13 App. D. C. 107; *Re Mower,* 15 App. D. C. 144.)

3. The rules of law as to what constitutes a prior use, and what constitutes a reduction to practice, are the same.

No. 324. Patent Appeals. Submitted November 23, 1905. Decided January 4, 1906.

HEARING on an appeal from a decision of the Commissioner of Patents in an interference case. *Affirmed.*

The facts are sufficiently stated in the opinion.

*Mr. Walter H. Chamberlin* and *Mr. George L. Wilkinson,* for the appellants.

*Messrs. Poole & Brown* and *Mr. C. Clarence Poole* for the appellee.

Mr. Justice McComas delivered the opinion of the Court:

This is an appeal from a decision of the Commissioner of Patents in an interference. The subject is emergency knuckles for car couplers.

The issues of the interference are as follows:

"1. In automatic car couplers, an emergency coupling attachment designed to closely and interchangeably fit at one end in coupling engagement with all forms of the vertical plane type of coupler, having a rotative hook or knuckle, and provided at its other end with an opening to receive a vertical pivot pin by which it is adapted to be connected with another coupler, a coupling knuckle, or analogous coupling device.

"2. In automatic car couplers, an emergency coupler attachment designed to be hinged at one end to the drawhead in place of the usual swinging knuckle, and provided at its other end with a hook and with a guard arm, the hook being adapted to closely and interchangeably fit, and to be automatically coupled to all forms of the vertical type of coupler having a rotative hook or knuckle.

"3. In automatic car couplers, an emergency coupler attachment designed to be hinged at one end, to the drawhead in the place of the usual knuckle, and provided at its other end with a knuckle adapted to automatically inter-couple with the rotating knuckle of an adjacent coupler in a manner to retain the inter-coupled drawheads in substantial alinement with each other.

"4. In automatic car couplers, an emergency coupler attachment designed to be hinged at one end to the drawhead in place of the usual knuckle, and provided at its other end with a rigid knuckle, and in rear of said knuckle with a guide arm, said rigid knuckle and guide arm being adapted to automatically inter-couple with the rotating knuckle of an adjacent coupler in a manner to retain the drawheads in substantial alinement with each other.

"5. An emergency car-coupler knuckle comprising a lug adapted to be pivoted between the ears of a coupler head, a guard member extending from the lug, and forming with the knuckle

head a space to receive the head of the knuckle of a co-operating coupler, and a web extending between said lug and the rear surface of said guard member."

All of the Patent Office tribunals decided this interference in favor of James A. Hinson, the appellee, and, from the final decision of the Commissioner of Patents, George H. Gilman and James H. Brown have taken their appeal to this court.

The appellee filed his application on August 19th, 1903.

The appellants filed their application March 14th, 1904.

The appellee died in May of the last-mentioned year, and his case rests upon the record date of the filing of his application, and no testimony has been taken to show the date of the appellee's conception and reduction to practice of the invention. It appears from the record that the appellee's emergency knuckle was placed on the market about the time his application was filed.

The testimony in behalf of the appellants tends to show conception and reduction to practice in 1898, although they have neither manufactured the device, nor placed it on the market.

The subject of this interference is a knuckle for car couplers, to be used in emergencies in place of a broken knuckle of any Master Car Builders' type.

The act of Congress of March 2d, 1893, passed in compliance with President Harrison's earnest urgency upon Congress, and the act of March 2d, 1903, amending the prior act, greatly stimulated the production of such devices, for the first act plainly forbade the use of cars which could not be coupled together automatically by impact by means of the couplers actually used on the cars to be coupled.    *Johnson* v. *Southern P. Co.* 196 U. S. 16, 49 L. ed. 369, 25 Sup. Ct. Rep. 158.

In accordance with this legislation, the Master Car Builders adopted regulations with which all car couplers must conform. More than a hundred different types of automatic car couplers, all conforming to the Master Car Builders' requirements, having knuckles adapted to swing in a horizontal plane upon a vertical axis, each of which is capable of interlocking with the knuckles of all other Master Car Builders' types of couplers,

testify to the zealous interest of inventors in this field. The knuckle of each type of coupler is of special construction, capable of use only with a coupler of its own special type. It is characteristic of the knuckles of the several types that they are capable of interlocking with all other types of couplers, and also that, whatever may be the material out of which they may be made, they are very liable to break. The latter characteristic led to the invention involved in this controversy.

A train of cars contains cars equipped with various types of Master Car Builders' couplers. It is impossible for each train to carry a supply of knuckles of all types. Prior to 1898, when the appellants first marketed their original type of emergency knuckle, when a knuckle was broken it was usual to connect the broken coupler with the coupler on the adjoining car by means of a link and pin and this required the brakeman to go between the cars. This proved a very unsatisfactory and dangerous substitute; therefore, the purpose of the invention in issue is to provide a knuckle to co-act with any of the various forms of knuckles in use, and which can be substituted for any of those forms in case of breakage, and it is one of great importance to the railway industry.

The appellants, both practical railroad men, devised an emergency knuckle to interlock with all types of Master Car Builders' knuckles and capable of instant use in lieu of a broken knuckle on all forms of Master Car Builders' couplers, and obtained a patent for their invention on August 16th, 1898.

The adoption and operation of the knuckle covered by the patent is not material here. It suffices to notice that in using that type of emergency knuckle it becomes necessary to remove some parts of the locking mechanism in most of the different types of Master Car Builders' couplers. This fact led the appellee to seek to devise an emergency knuckle which would replace a broken knuckle without necessitating the removal of any of the parts of locking mechanism.

The testimony in behalf of the appellants shows the conception of their device in July, 1898; the making of a sketch and the completion of a rough wooden pattern in September of that

year, and about the same time the making of a brass casting from such pattern, and later of a finished wooden pattern and the making therefrom of a gray iron casting. In September of the same year they made a test of the brass casting, which casting appellants claim was substantially the same in construction as the emergency knuckle described and claimed in the appellants' application involved in this interference. It was substituted for a knuckle upon a car in the yards of the Northern Pacific Railroad Company, at South Tacoma, Washington, and coupled with a car provided with a standard Master Car Builders' coupler. A train composed of a number of cars back of the brass casting was hauled by an engine several miles, around curves and over switches in those yards. During the test the brass casting was coupled and uncoupled a number of times with the knuckle of the adjacent coupler, and never accidentally uncoupled. Before the conclusion of the test, however, the brass coupler broke. A wooden pattern in evidence was then made from the rough wooden pattern previously used in making the brass casting. From this later pattern a gray iron casting was made, which casting was placed upon a car to demonstrate that it was interchangeable with Master Car Builders' knuckles. The appellants appear to have been convinced that this knuckle, so constructed, was indeed operative and practical, but would not prove as satisfactory as their emergency knuckle covered by their patent No. 609,095, because their patented knuckle could be used when one of the ears of the drawbar had been broken, as the shank bearing against the inner wall of the drawbar, together with the remaining ear on the coupler, afforded a sufficiently secure support for the knuckle, while an emergency knuckle of the brass casting type could only be used when both ears of the coupler were intact. The appellants, therefore, proceeded to the manufacture and marketing of the emergency knuckles covered by their patent, of which, through their assignees, the Railway Appliances Company, about 50,000 had been sold during the five years prior to the taking of testimony upon this reference. Nothing more was done by the appellants respecting the invention involved in this interference

until they learned that the appellee's emergency knuckle had been placed on the market. The Railway Appliances Company, finding that the appellee's knuckle was selling in competition with the appellants' patented knuckle, which this company was then manufacturing, the former at $3.50 each, while they were selling the appellants' patented knuckle for $4 each, were much concerned.

It appears that the appellee, as we have said, filed his application on August 19th, 1903, for an emergency knuckle of the same type as the brass and gray iron casting made by the appellants in 1898, and commenced the manufacture and sale of his device soon thereafter. Thereupon the appellants, on March 14th, 1904, filed an application covering the same invention, which was, on May 17th, 1904, placed in interference with the application of appellee.

The errors assigned are that the Commissioner erred in holding that the appellants did not actually reduce the invention to practice in September, 1898, and in holding that appellants were estopped from claiming priority of invention by reason of their delay in filing their application, and in determining to grant a patent to appellee in view of the prior knowledge and use of the invention by appellants, and to award priority of invention to the appellee.

The appellants contend that section 4886 of the Revised Statutes (U. S. Comp. Stat. 1901, p. 3382) requires that an applicant can only obtain a patent for his invention "not known or used by others in this country before his invention or discovery thereof;" that of several distinct inventors of the same invention one only is entitled to receive a grant of the exclusive right, namely, the original, the first inventor. "The first inventor is that original inventor whose inventive act, in point of time, preceded the inventive acts of others." 1 Robinson, Patents, p. 92.

The appellants object that the Commissioner of Patents, against the plain intent of the law, decided that their right to a patent becomes subordinate to another inventor whose efforts have given to the public the benefit of the invention.

The appellants say that the object of the interference proceeding is to determine which of the two or more claimants is the first inventor, and to establish thereby the statutory bar of prior knowledge and use, to serve as the basis for rejecting the application of the later inventor, and insists that appellants have proved that they knew of and used the invention prior to the appellee's conception, August 19th, 1903. The testimony on behalf of appellants is that of both Gilman and Brown, the appellants, of Anslow, who made the brass casting, of Lister, who made the pattern in evidence, of Yorktheimer, who made the gray iron casting, and of Cook, who saw the brass and gray iron casting, the rough pattern, and the finished pattern, and also witnessed the test of the brass casting. This testimony constitutes a qualified prior knowledge and use; that is, the very limited use before stated, of the appellants' invention.

However, on behalf of the appellee it is important to consider whether such knowledge and use of the appellants is adequate to show any such reduction to practice as is required in this interference to entitle the appellants to a patent for this invention. It does not appear from the record that the gray iron casting was subject to an actual test. The brass casting, though claimed then to work satisfactorily, was broken in the only test made of it. The rough wooden model of it was lost or destroyed, and the broken parts of the brass casting discarded. The proof is not quite clear as to whether the brass casting was like the knuckles shown in appellants' drawing accompanying their application. No casting has been made from the wooden pattern submitted in this case.

The Master Car Builders' couplers are made of malleable iron and cast steel, and the Gilman and Brown emergency knuckles, already patented, are made of steel. It is settled that, to constitute a reduction to practice, the device constructed must be fashioned out of a material capable of actual use for the intended purpose.

In *Paul* v. *Hess,* 24 App. D. C. 467, it is said: "It was therefore necessary for the inventor to show that a typewriting machine supplied with the new bars had been constructed and

tested sufficiently to show that it was capable of successfully performing the work for which it was intended. * * * Notwithstanding Paul's statement that he was satisfied with the practical success of the new bar, his action thereafter, and that of the company with which he was engaged, point to a different conclusion."

The Commissioner of Patents, in his decision, said: "I agree with the Examiner-of-Interferences and the Examiners-in-Chief in their opinion that the tests given to the brass knuckle in 1898 establishes the fact that that knuckle was not adapted for practical use. Both the material of which it was made and the shape of the knuckle had to be changed. The only fact which is positively established is that the knuckle would break after a short test on an improvised train of cars hauled by a switching engine in the freight yards."

The tribunals of the Patent Office appear justified in concluding that the brass casting was unlike the wooden pattern exhibited, and did not afford satisfactory evidence of its exact construction. If that casting had been successfully used, it would not, therefore, establish a reduction to practice of the knuckle shown in appellants' drawings. The brass casting, made from a crude wooden pattern, was correspondingly crude, and was broken in the test, and obviously possessed such defects that it could not be considered a reduction to practice. The brass casting and the gray iron casting were made of metals not suitable for practical use; rather they were models. The gray iron casting was not actually tested, while the brass casting broke in the test. These did not prove a satisfactory reduction to practice.

The conduct of the appellants after the tests suggests that the results of the tests were unsatisfactory, and that this device was abandoned. They did not further proceed to develop their conception until they filed their application more than five years later, while at the same time their emergency knuckle, which had been patented, was manufactured and sold by the thousands. The appellant, Gilman, does not know what became of the gray iron casting, and did no further experimenting

until Hinson's device came to his notice. This gray iron casting, having been once placed in a coupling head, "to show people how it would work," thereafter disappeared. Appellant Gilman frankly says: "I made a test of it myself, and it did not prove as satisfactory as I expected, and I staid with the old one." It appears that appellants proceeded to develop a third plan of an emergency knuckle, and dropped that. They believed the old one, which had been patented, answered all purposes. They considered the old one better than their invention in this interference. Nor did the Railway Appliances Company, which had bought the appellants' right to the use of the invention, take any action until they learned of the appearance of Hinson's knuckle, placed on the market by the National Car Coupler Company. After that, this company, the assignee, spurred up the appellants to make an application, and the appellant Gilman frankly admits that the appearance of Hinson's emergency knuckle hurried the appellants' application. The Hinson knuckle was sold for $3.50, and the appellants' patented knuckle for $4. Secretary Manchester, of the Railway Appliances Company, says that he endeavored to induce the National Car Coupler Company to sell the Hinson knuckle for the same price Manchester obtained for the Gilman and Brown patented knuckle.

There is much evidence besides to show that the appellants did not, in 1898, reduce their conception to a practical form. The burden of proof is upon the appellants to show, not only a complete reduction to practice, but also to account for their long period of delay and inaction.

In *Fefel* v. *Stocker,* 17 App. D. C. 321, this court said: "Moreover, its apparent abandonment by Stocker, and the long and wholly unexplained delay of more than four years in the application for a patent, are strongly indicative of the fact that the original machine of Stocker was not a successful reduction to practice, and was no more than an abandoned experiment. Long and unexplained delay in the application for a patent is always significant in such cases, especially when, as here, the parties in interest were actively engaged in the prosecution of other similar applications; and such delay raises a presumption

which it is incumbent on the applicant to rebut by clear and satisfactory proof."

. And again, in *Funk* v. *Haines,* 20 App. D. C. 288: "The onus of proof is upon any junior applicant to show, not only priority of invention, but he must also show that he has used reasonable diligence in adapting and perfecting his invention; for, in such case, the mere conception without actual reduction to practice within a reasonable time does not avail a junior party making the claims."

We agree with the Commissioner of Patents that the facts of this case bring it within the scope of those decisions of this court in which it was held that what was done by the claimant fell short of a reduction to practice, and amounted to nothing more than an abandoned experiment.

The appellants' device appears to have been an experimental model, abandoned or laid aside and lost by its makers, and recalled to mind afterward by the advertisement of the appellee's similar device.

The decisions on this point are very numerous, and among them we only cite: *Glidden* v. *Noble,* 5 App. D. C. 480; *Guilbert* v. *Killinger,* 13 App. D. C. 107; *Re Mower,* 15 App. D. C. 144; *Paul* v. *Hess,* 24 App. D. C. 462.

. In *Paul* v. *Hess,* 24 App. D. C. 468, this court said: "Long delay in making use of an invention claimed to have been reduced to practice, or in applying for a patent, has always been regarded as a potent circumstance tending to show that the alleged reduction to practice was nothing more than an unsatisfactory or abandoned experiment. * * * And this is specially the case where, in the meantime, the inventor has been engaged in the prosecution of similar inventions, * * * or others, without reasonable explanation, have been adopted for manufacture and commercial use.

The device of the appellants in 1898 'was neglected while its inventors sought to devise other devices for the same purpose, and they developed commercially their prior patented device for such purpose. They did nothing toward obtaining a patent until after Hinson had marketed his device, and the appellants then

only applied on March 14th, 1904. The appellants slept on their rights, and for more than five years they failed to bring their invention to a complete and operative form. The cases strongly urged by the appellants mostly relate to a completed invention known already, before the discovery thereof by the rival inventor.

We concur with the Examiners-in-Chief in this case. The rules of law as to what constitutes a "prior use" and what constitutes a "reduction to practice" are the same. As there is not sufficient proof of a reduction to practice, so, also, there is not sufficient proof of "prior use."

By their laches the appellants lost rights which for a long time they little valued, and which, therefore, they cannot now successfully assert.

The decision of the Commissioner of Patents in this case is affirmed. The clerk of this court will certify this opinion and the proceedings in this cause according to law to the Commissioner of Patents, to be entered of record in his office.

*Affirmed.*

A petition to the Supreme Court of the United States for the writ of certiorari to this court was denied February 23, 1906.